STATE OF WEST VIRGINIA

*v.*

MARSHALL WEST

(No. 13037)

Submitted September 25, 1973. Decided December 4, 1973.

*Arthur T. Ciccarello, Allan H. Masinter* for plaintiff in error.

*Chauncey H. Browning, Jr.,* Attorney General, *Richard E. Hardison,* Deputy Attorney General, *David P. Cleek,* Assistant Attorney General, for defendant in error.

NEELY, JUSTICE:

This is an appeal from a conviction for grand larceny from the Intermediate Court of Kanawha County, West Virginia. In September 1968 a two count indictment was returned against the defendant charging him, in the first count, with larceny of a quantity of cigarette tax stamps worth six thousand dollars, and in the second count with the crime of embezzlement of such stamps. Trial began on September 10, 1969, and the jury found the defendant guilty of larceny on September 19, 1969 as charged in the indictment.

The State argues that the evidence demonstrated that in February 1968, the defendant was employed as an Assistant Attorney General of the State of West Virginia and that he obtained from Chester Tinsley, who was then an employee of the State Tax Department, one hundred thousand cigarette tax stamps. According to the State's witnesses the defendant told Mr. Tinsley that he wanted the cigarette tax stamps for the purpose of setting a trap for "some crook" in the Wheeling area, and that after obtaining the stamps, the defendant obtained a sub-jobber's application from the tax department on or about February 28, 1968 and received a license to deal in cigarette tax stamps in the name of Everett Miller.

According to the State's evidence, in March 1968 the Tax Commissioner of the State of West Virginia met

with Mr. Yeater and Mr. Shrewsbury, members of the Department of Public Safety, and obtained from them four cartons of cigarettes with hand applied tax stamps. These cartons of cigarettes were then delivered to Chester Tinsley for a determination of authenticity. After Mr. Tinsley received the questioned packages of cigarettes from the Tax Commissioner, he contacted the defendant concerning the disposition of the stamps which he had given the defendant, but Mr. Tinsley received no satisfactory reply. Mr. Tinsley then went to the Tax Commissioner and informed the Commissioner of all the circumstances concerning the tax stamp transaction. The Commissioner gave Mr. Tinsley one week in which to return the stamps, whereupon Mr. Tinsley contacted the defendant and informed him of the Commissioner's deadline. On the following night Mr. Tinsley received a telephone call from the defendant, and following the defendant's directions, Mr. Tinsley went to a restaurant in Kanawha City and obtained a key, and then went to the Greyhound Bus Station in Charleston and recovered a substantial portion of the cigarette tax stamps that he had given to the defendant. Mr. Tinsley then returned the stamps to the Tax Commissioner, and upon an accounting of the stamps, it was determined that approximately thirty-three thousand of the original hundred thousand had been returned. State's witness Clifford Lantz testified that on or about September 7, 1968 he discussed the matter with the defendant, and that as a result of that conversation the defendant made restitution to the Tax Department in money for the missing stamps. Upon all the evidence the jury could have found and did find the defendant guilty of grand larceny by embezzlement.

There are five principal assignments of error. The first is that the State cigarette tax stamps, worth six thousand dollars in the open market, are not the subject of larceny although defendant admits that the paper valued at twenty-seven dollars, is the subject of larceny. The defendant cites in support of his position the case of

*State v. Crumbey,* 81 W.Va. 287, 94 S.E. 137 (1917) which held in part:

> "Theft of an incomplete and ineffective paper which, if complete and effective, would call for the payment of money, is larceny of the paper only, not of the amount of money it would call for, if complete."

The *Crumbey* case involved the theft of railroad transfers and ferry tickets which required either a stamp or counter signature in order to make them effective. Accordingly, the *Crumbey* case is not on point, as the cigarette tax stamps involved in this case were immediately worth six thousand dollars without any further action on the part of the defendant or the State Tax Department. Chapter 61, Article 3, Section 14 of the *Code of West Virginia,* 1931, says:

> "If any person steal any bank note, check, or other writing or paper of value, or any book of accounts for or concerning money or goods due to be delivered, he shall be deemed guilty of the larceny thereof, and receive the same punishment, according to the value of the article stolen, that is prescribed for the punishment of larceny of goods or chattels."

It is only by force of this section that bank notes, checks and other writings and papers of value are made the subject of larceny, as at common law they were not the subject of larceny. *State v. McCoy,* 63 W.Va. 69, 59 S.E. 758 (1907). However, it is obvious that cigarette tax stamps are writings or papers of value as contemplated by *Code,* 61-3-14, and therefore they are the subject of larceny by virtue of the statute. This Court, therefore, finds no merit to this assignment of error.

Defendant's second assignment of error is that the tax stamps should not have been admitted into evidence on the grounds that they were not legal cigarette tax stamps because they failed to show the value and denomination on the stamps themselves to produce a "face value". This argument is grounded in Chapter

11, Article 17, Section 11 of the *Code of West Virginia,* 1931, as amended, which states:

"In the preparing of said stamp or stamps the same shall have printed or impressed thereon the words 'State of West Virginia—Cigarette Tax Stamp' and such other words and figures as [the Commissioner] may deem proper to show the value and denomination of the stamp or stamps. . . . Such stamps shall be sold and accounted for at the face value thereof. . . ."

The defendant argues that without a "face value," as demonstrated through words and figures on the stamps, the stamps are merely pieces of paper and are invalid in this case as exhibits, because they are not legal tax stamps.

*Code,* 61-3-14 speaks of a "writing or paper of value" and makes that a subject of larceny. Even if the tax stamps in question were not *de jure* tax stamps, according to the precise directive of *Code,* 11-17-11, they were certainly *de facto* tax stamps, and had a value of six thousand dollars on the open market. Accordingly, they were writings or papers of value and could be exhibited to the jury as such along with testimony that the State Tax Commissioner regularly sold them at the fair market value of six cents apiece. Therefore we find no merit to the defendant's second assignment of error.

The third assignment of error is that the court improperly gave State's Instruction No. 2, which said:

"The Court instructs the jury that under the indictment in this case, one of eight verdicts can be returned:

1. Grand larceny.

2. Petit lareny.

3. Grand larceny by embezzlement.

4. Petit larceny by embezzlement.

5. Larceny by obtaining property by false pretenses.

6. Grand larceny by receiving and transferring stolen property.

7. Petit larceny by receiving and transferring stolen property.

8. Not Guilty."

Defendant maintains that under the two count indictment alleging both the crimes of larceny and embezzlement, the State was required to elect upon which count it wished to proceed at the conclusion of the State's case. The State properly elected to proceed on the larceny charge, and defendant now maintains that the instructions which permitted the jury to find the defendant guilty of larceny by embezzlement, larceny by obtaining goods by false pretenses, and larceny by receiving and transferring stolen property were improper, and tended to prejudice the jury against the defendant. For the following reasons this Court does not find merit in this argument.

First, Chapter 61, Article 3, Section 18 of the *Code of West Virginia,* 1931, provides that:

> "If any person buy or receive from another person, or aid in concealing, or transfer to a person other than the owner thereof, any stolen goods or other thing of value, which he knows or has reason to believe has been stolen, he shall be deemed guilty of the larceny thereof, and may be prosecuted although the principal offender be not convicted."

Therefore, under an indictment for larceny, the State can make its case by demonstrating that the defendant received goods which he knew or had reason to believe had been stolen; it is not necessary to prove that the defendant actually took the goods himself. If a defendant is indicted for a simple larceny, and upon a trial it appears that he did not actually steal the property but did receive it with knowledge of the theft, he is nevertheless guilty of the larceny and subject to the same penalties. *State v. Goldstrohm,* 84 W.Va. 129, 99 S.E. 248 (1919).

Secondly, Chapter 61, Article 3, Section 20 of the *Code of West Virginia,* 1931, says in part:

> "If any officer, agent, clerk or servant of this State, or of any county, district, school district, or municipal corporation, or of any banking institution, or other corporation, or any officer of public trust in this State, or any agent, clerk or servant of any firm or person, or company or association of persons not incorporated, embezzle . . . money, bank notes, drafts, security for money, or any effects or property of any other person, which shall have come into his possession, or been placed under his care or management, by virtue of his office, place or employment, he shall be guilty of the larceny thereof. . . ."

Under this section, a defendant under common law indictment for larceny may be convicted of that offense by proof that he embezzled the property alleged to have been stolen. *State v. Workman,* 91 W.Va. 771, 114 S.E. 276 (1922).

Lastly, Chapter 61, Article 3, Section 24, of the *Code of West Virginia,* 1931, provides in part:

> "If any person obtain from another, by any false pretense, token or representation, with intent to defraud, money, goods or other property which may be the subject of larceny, or, if he obtain from another any money, goods or other property, which may be the subject of larceny, on credit, by representing that there is money due him, or to become due him, and shall assign his claim for such money, in writing, to the person from whom he shall obtain such money, goods or other property, and shall afterwards collect the same without the consent of such assignee, with intent to defraud, he shall, in either case, be deemed guilty of larceny; . . . ."

It is well settled by adjudicated cases that an indictment for larceny may be sustained by proof that the property, alleged to have been stolen, was in fact obtained by false pretenses, with intent to defraud, *State v. Williams,* 68 W.Va. 86, 69 S.E. 474 (1910), and under a count for simple larceny it is admissible to prove that the property was obtained by false pretenses, with intent to defraud.

*State v. Lilly,* 112 W.Va. 231, 164 S.E. 242 (1932). Accordingly there was no error in the trial court's giving of State's Instruction No. 2.

Defendant's fourth assignment of error concerns the action of the trial judge in restricting defense counsel to an examination of those portions of written notes which a State's witness actually used to refresh his recollection, and the judge's refusal to permit defense counsel to read all of the notes which the witness had brought to the stand. It appears that State's witness Charles Williams testified about a conversation he heard between the defendant and another party. Williams used notes to refresh his memory, and on cross-examination defense counsel asked to see all of the notes. The State moved the court to restrict the defendant's examination of the notes to those portions actually used by the witness to refresh his memory, and the court granted the motion, although later in chambers defense counsel was permitted to read all of the notes. We see no error in the trial court's action with regard to the notes. If notes which a witness happens to have in his hands, but which are not used to refresh his recollection are available for examination by opposing counsel, then opposing counsel should also be entitled to examine the witness's wallet, other personal papers which he has in the courtroom, and by analogy anything else which he may have in his office or private residence. We find no error in the court's restricting defendant's counsel to those notes actually used by the witness to refresh his recollection. Other material may be obtained by proper discovery motions before trial.

The fifth assignment of error, however, is meritorious. The record demonstrates that during the impaneling of the twenty jurors from which the defendant and the State were to select twelve by the statutory process of elimination involving the use of peremptory challenges, one James F. Coleman was placed upon the panel. At the time of trial Mr. Coleman was an employee of the Department of Public Safety of the State of West

Virginia, and the defendant challenged him for cause as a member of the original panel of twenty because of his employment by a law enforcement agency of the State. Defendant assigns as error the denial of his challenge for cause, and alleges prejudice because he was required to exercise one of his peremptory challenges to eliminate juror Coleman from the final panel of twelve which was to hear the case.

Chapter 62, Article 3, Section 3 of the *Code of West Virginia,* 1931, as amended, provides in part:

> "In a case of felony, twenty jurors shall be drawn from those in attendance for the trial of the accused. If a sufficient number of jurors for such panel cannot be procured in this way, the court shall order others to be forthwith summoned and selected, until a panel of twenty jurors, *free from exception,* be completed, from which panel the accused may strike off six jurors and the prosecuting attorney may strike off two jurors. . . ." [Emphasis supplied.]

In the case of *State v. Dushman,* 79 W.Va. 747, 91 S.E. 809 (1917) this Court held in syllabus pt. 1:

> "By section 3, chapter 159, Code 1913, one accused of a felony is entitled as a matter of right to a panel of twenty jurors, unexceptionable under the rules of the common law, before being called upon to exercise his right of peremptory challenge."

*Dushman* held that an employee of a railroad company is *prima facie* disqualified to sit as a juror in the trial of a person indicted for stealing or buying and receiving stolen property of the same railroad company. The United States Supeme Court has also spoken on the subject of disqualification of a juror because he is the servant of one of the parties. In the case of *Crawford v. United States,* 212 U.S. 183, 29 S. Ct. 260, 53 L. Ed. 465 (1909), a juror was called in the District Court who was both a druggist and a clerk of the United States Government Post Office in the sub-postal station located in his drugstore. The defendant challenged the juror for cause,

asserting the objection that he was a salaried officer of the government. A federal statute in the District of Columbia rendered incompetent as a juror "all executive and judicial officers, salaried officers of the Government of the United States and of the District of Columbia." The Supreme Court of the United States held that the disqualification within the statute did not alter or restrict the common law rules which excluded a juror in a case if the juror were a master, servant, steward, counselor or attorney of either party. The Court said, "In such case, a juror may be challenged for a principal cause as an absolute disqualification of the juror." The Supreme Court then went on to say:

> "Modern methods of doing business and modern complications resulting therefrom have not wrought any change in human nature itself, and therefore have not lessened or altered the general tendency among men, recognized by the common law, to look somewhat more favorably, though perhaps frequently unconsciously, upon the side of the person or corporation that employs them, rather than upon the other side. . . . The law therefore most wisely says that with regard to some of the relations which may exist between the juror and one of the parties, bias is implied, and evidence of its actual existence need not be given.
>
> "[A]nd the juror ought not to be permitted to occupy a position of that nature to the possible injury of a defendant on trial, even though he should swear he would not be influenced by his relations to one of the parties to the suit in giving a verdict. It was error to overrule the defendant's challenge to the juror."

Common law has generally been circumspect in permitting any juror to sit who is related to either party through kinship or interest. Furthermore, a juror, at common law, was *prima facie* disqualified if, in addition to those qualities mentioned above and mentioned in the *Crawford* case, he was of the same society or corporation as a party. 11 M.J. *Jury,* § 33. General statutory directives

do not remove these common law disabilities, and as *Dushman, supra* has held, the common law disabilities remain in force unless superseded by express statutory terms. The proliferation of responsibilities undertaken by the State and local governments and the historical tendency for the proportion of governmental employees to increase in society, cause us to doubt that all employees of State government are *prima facie* disqualified to sit as jurors in a criminal case. Each case must be evaluated on its own facts; however, we do hold it reversible error to permit a challenged juror who is an employee of the Department of Public Safety, a law enforcement arm of the State, to be a member of a panel of twenty. Obviously, by virtue of the prospective juror's association with enforcement officials he is subject to potential prejudice and peremptory challenges should not be required to disqualify him. The object of the law regarding jury selection is to secure jurors whose minds are wholly free from bias or prejudice. *State v. Hatfield,* 48 W.Va. 561, 37 S.E. 626 (1900); *State v. Messer,* 99 W.Va. 241, 128 S.E. 373 (1925). Furthermore, as far as practicable the process of selecting jurors should endeavor to secure jurors who are not only free from prejudice, but who are also free from the suspicion of prejudice. *State v. Siers,* 103 W.Va. 30, 136 S.E. 503 (1927).

It appears to this Court that there would be no reason to disqualify an elevator operator in the State Capitol Building from sitting on a criminal jury in Kanawha County, or to disqualify a State Road employee merely because he is an hourly employee of the State. But when the defendant can demonstrate even a tenuous relationship between a prospective juror and any prosecutorial or enforcement arm of State government, defendant's challenge for cause should be sustained by the court. A defendant is entitled to a panel of twenty jurors who are free from exception, and if proper objection is raised at the time of impaneling the jury, it is reversible error for the court to fail to discharge a juror who is obviously objectionable. In any case where the trial court is in

doubt, the doubt must be resolved in favor of the defendant's challenge, as jurors who have no relation whatsoever to the State are readily available.

Accordingly, the judgment of the Intermediate Court of Kanawha County is reversed and the case is remanded for a new trial.

*Reversed and remanded for a new trial.*